**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HENRY EARL HOWZE,                     )
                                      )
                    Plaintiff,        )          Civil Action No. 12-160 Erie
                                      )
        v.                            )
                                      )
CAROLYN W. COLVIN,[1]                 )
Acting Commissioner of Social Security, )
                                      )
                    Defendant.        )

## MEMORANDUM OPINION AND ORDER OF COURT

September 3, 2013.

## I. INTRODUCTION

Henry Earl Howze ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq.* Plaintiff filed his applications on March 31, 2010, claiming disability since October 19, 2006. (R. 141-152).[2] His applications were denied (R. 77-79), and following a hearing held on July 7, 2011 (R. 30-56), the administrative law judge ("ALJ") issued a partially favorable decision, finding that the Plaintiff had been disabled since December 1, 2010, but not prior to that date. (R. 13-23). Plaintiff's request for review by the Appeals Council was denied (R. 1-6), rendering the Commissioner's decision final under 42

---

[1] Ms. Colvin became the Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as the named defendant in this suit in place of Michael J. Astrue, who previously served as Commissioner. *See* Fed.R.Civ.P. 25(d).
[2] References to the administrative record [ECF No. 6], will be designated by the citation "(R. ___)". Plaintiff previously filed applications for DIB and SSI that were denied on May 12, 2009. (R. 60-68). In the decision that is the subject of the instant appeal, the administrative law judge found good cause for reopening the Plaintiff's prior DIB application, thus allowing the onset date to be October 19, 2006 rather than May 13, 2009, the day after the prior administrative law judge's denial. (R. 13-14; 16).

U.S.C. § 405(g). Plaintiff filed his complaint challenging the ALJ's decision, and presently pending before the Court are the parties' cross-motions for summary judgment. For the following reasons, the decision of the ALJ will be vacated and the case remanded to the Commissioner for further proceedings.

## II. BACKGROUND

### A. Medical evidence prior to December 1, 2010

Plaintiff was seen by David Hutzel, M.D., on July 31, 2006 for complaints of chronic headaches. (R. 250). Dr. Hutzel was of the opinion that Plaintiff's headaches were "clearly" related to his history of a heat stroke. (R. 250). His hypertension medication was changed to avoid exacerbation of his headaches. (R. 250). Dr. Hutzel reported that Plaintiff's chronic low back pain was stable, and recommended that Plaintiff continue with routine stretches for his chronic neck pain. (R. 250).

Plaintiff returned on August 9, 2006 and complained of diffuse spinal pain resulting in severe headaches, exacerbated by temperature changes. (R. 249). Dr. Hutzel indicated that Plaintiff's headaches were "likely multifactorial", related to smoking, temperature sensitivity, and possible spinal problems. (R. 249). Dr. Hutzel ordered x-rays, referred Plaintiff to a neurologist, prescribed Pamelor for his headaches, and urged him to stop smoking. (R. 249). He noted that Plaintiff's blood pressure was poorly controlled and changed his medication. (R. 249). Plaintiff's nuclear stress test dated August 4, 2006 was normal. (R. 235-236; 249).

Lumbar spine x-rays dated August 9, 2006 showed normal vertebral body alignment. (R. 244). There was some disk space narrowing seen at the L5-S1 level. (R. 244). No significant bony abnormalities were seen. (R. 245). Thoracic spine x-rays revealed thoracic spondylosis. (R. 245). Vertebral body heights were adequately maintained, and posterior elements were intact. (R. 245). An MRI of Plaintiff's cervical spine dated August 14, 2006 showed a congenital anomaly of the C2 and a hypoplastic C2-3 disk. (R. 243). The MRI further revealed a developmentally small sized canal, with superimposed spondylosis, creating areas of canal stenosis at the C3-4, C5-6 and C6-7 levels. (R. 243).

Plaintiff returned to Dr. Hutzel on August 16, 2006 and complained of headaches. (R. 248). Dr. Hutzel reported that Plaintiff's MRI revealed diffuse cervical stenosis on multiple levels and referred him to a neurosurgeon. (R. 248). Plaintiff's medications were adjusted, and he was advised to stop smoking and discontinue his anti-inflammatory usage. (R. 248).

Plaintiff was seen by Jeffrey Esper, D.O., a neurologist, on September 12, 2006, and reported suffering from frequent headaches in the summer months with associated nausea, photo sensitivity, and phonophobia. (R. 304). He indicated that his headaches were triggered by stress, heat, back discomfort and smells. (R. 304). He reportedly took Tylenol with codeine, and had recently been prescribed Pamelor. (R. 304). Dr. Esper observed that Plaintiff's MRI showed evidence of a congenital anomaly, as well as stenosis on multi levels. (R. 305). On physical examination, Dr. Esper found that Plaintiff's neck was supple, there was no edema in his extremities, his neurological examination was normal, and his cranial nerve examination was normal. (R. 305-306). Dr. Esper further found that Plaintiff's strength was 5/5, and his tone and bulk were normal. (R. 306). Sensory examination revealed a gradient to his bilateral upper extremities, but it was otherwise intact to all modalities in the remainder of his extremities. (R. 306). Dr. Esper reported that Plaintiff's reflexes were 2/4 in his right upper extremity, and 1/2 in his left upper extremity. (R. 306). Plaintiff's gait was stable, he was able to heel-toe-tandem walk without difficulty, and his Romberg was negative. (R. 306).

Dr. Esper was of the view that Plaintiff was suffering from a combination of migraine and rebound headaches due to his overuse of Tylenol with codeine. (R. 306). He recommended that Plaintiff follow a migraine diet, limit his Tylenol usage, and take Pamelor prophylactically. (R. 306). He advised Plaintiff to consider undergoing a sleep study if the recommended changes failed to resolve his symptoms. (R. 307).

On September 15, 2006, Plaintiff reported fewer headaches when seen by Dr. Hutzel. (R. 247). Dr. Hutzel reported that Plaintiff continued to have diffuse nonspecific erratic neurological symptoms with no neurological changes. (R. 247). There were no acute abnormalities found on neck examination. (R. 247). Plaintiff's sensation, deep tendon reflexes, strength and distal pulses were equal bilaterally. (R. 247). Plaintiff's blood pressure remained poorly controlled

and he was advised to stop smoking.  (R. 247).  Dr. Hutzel was of the opinion that Plaintiff's cervical spinal stenosis was a significant contributing factor for his neurological symptoms.  (R. 247).

Plaintiff was evaluated by Isam Khoja, M.D. on October 30, 2006 for complaints of back pain, daily migraine headaches, degenerative disc disease of the neck, excessive fatigue, and balance problems.  (R. 333).  He reported a history of, *inter alia*, quadruple bypass surgery, high blood pressure, shortness of breath, memory problems, anxiety and depression.  (R. 333).  Dr. Khoja reported that Plaintiff's affect was depressed.  (R. 333).  On physical examination, Dr. Khoja found that Plaintiff had slight pain on hyperextension and flexion of his neck, but Spurling signs were negative.  (R. 334).  He found that Plaintiff had a positive straight leg raising test on the left side up to 85 degrees.  (R. 334).  Plaintiff exhibited 5/5 strength in extension and flexion in all four extremities, with no abnormal movements or tremors.  (R. 334).  His reflexes were +2/3 and symmetrical, and his sensation was intact.  (R. 334).

Dr. Khoja observed that Plaintiff's MRI demonstrated the presence of multiple degenerative disc disease between C3-4, 4-5, 5-6 and 6-7, with mild spinal stenosis at these levels.  (R. 334).  He diagnosed Plaintiff with cervical spondylosis and multiple degenerative disc disease, and was of the opinion that Plaintiff's headaches were related to his neck problems.  (R. 334).  Because Plaintiff was reluctant to undergo surgery, Dr. Khoja recommended an epidural block.  (R. 334).

Plaintiff returned to Dr. Hutzel on January 3, 2007 and reported having minimal headaches in the cooler months.  (R. 246).  Dr. Hutzel expressed concern that Plaintiff's recurrent headaches and heat sensitivity could be "life threatening" since he worked in construction.  (R. 246).  He recommended that Plaintiff consider applying for disability, stating that it was unsafe for him to work construction in the hot summer months.  (R. 246).  Dr. Hutzel reported that Plaintiff was non-compliant with his medications for financial reasons.  (R. 246).  Plaintiff reported that he declined neck surgery as recommended by Dr. Khoja.  (R. 246).  Dr. Hutzel found that Plaintiff was in no acute distress and his physical examination was unremarkable.  (R. 246).

Plaintiff was seen by Anthony Snow, M.D. on January 9, 2008 and reported a past history of hypertension, chronic back pain, coronary artery disease, and heat stroke. (R. 275). Plaintiff stated he could not afford recommended medications. (R. 275). Dr. Snow reported that Plaintiff was in no acute distress, and his physical examination was unremarkable. (R. 275). He prescribed blood pressure medication and ordered lab work. (R. 275). On April 17, 2008, Plaintiff complained of intermittent back pain. (R. 274),

On May 7, 2008, Plaintiff underwent a pharmacologic stress test for symptoms of chest discomfort unrelated to activities. (R. 267). It was noted that Plaintiff had a history of coronary artery disease, having had coronary bypass surgery in 2004. (R. 267). Plaintiff's stress test was normal, with no symptoms of chest discomfort or significant ST segment change seen. (R. 268). An echocardiogram performed the same date was also reported as normal. (R. 265).

Plaintiff returned to Dr. Esper on June 10, 2008 and complained of persistent headaches exacerbated by heat and exertion, and difficulties with balance. (R. 300-301). Plaintiff's physical examination remained essentially unchanged from his September 2006 visit, except he no longer exhibited any gradient on sensory exam, and Dr. Esper found there was a slight bilateral upper extremity intention tremor on the right. (R. 301). Dr. Esper formed an impression that Plaintiff's headaches were "mixed", with an underlying migraine tendency and cervical spine component. (R. 301). He found that Plaintiff had hyporeflexia which might reflect an element of peripheral neuropathy. (R. 301). Dr. Esper recommended a sleep study, ordered blood work and prescribed Pamelor. (R. 302). A sleep study performed on July 22, 2008 was mildly abnormal. (R. 284-285).

Plaintiff began treating with Gary Silko, M.D. on June 12, 2008 and reported a history of headaches, back pain, hypertension and coronary artery disease. (R. 426). Plaintiff indicated that his blood pressure was not well controlled and that medication adjustments had been unsuccessful. (R. 426). He reported that Dr. Esper recommended Pamelor for his headaches but he had not filled the prescription. (R. 426). Plaintiff stated that he had a herniated disc in his low back causing low back pain, and also suffered from chronic neck pain. (R. 426). Plaintiff reported bilateral carpal tunnel syndrome with wrist and hand pain. (R. 426). Plaintiff further

reported frequent sweating and sensitivity to hot temperatures. (R. 426). Plaintiff's physical examination was essentially normal. (R. 427). He was diagnosed with lower back pain, coronary arteriosclerosis, accelerated essential hypertension, and headache syndromes. (R. 427). Dr. Silko prescribed medications and advised Plaintiff to begin taking Pamelor as prescribed by Dr. Esper. (R. 427).

On July 22, 2008, Plaintiff reported to Dr. Silko that he was concerned about increased pain and numbness in his hands. (R. 418). Plaintiff stated that he had been diagnosed with carpal tunnel syndrome several years ago but chose not to have surgery. (R. 418). He further reported back pain with activities. (R. 418). His physical examination was unremarkable, but there was some weakness of his intrinsic hand muscles. (R. 419). Dr. Silko diagnosed the Plaintiff with lower back pain, improved hypertension, and carpal tunnel syndrome. (R. 419). He prescribed medications, ordered nerve conduction studies, and referred him to a hand surgeon. (R. 419).

An EMG performed July 23, 2008 showed bilateral carpal tunnel syndrome, left greater than right, and bilateral moderate chronic cervical polyradiculopathies involving the C5-T1 myotomes, left greater than right. (R. 416).

Plaintiff returned to Dr. Silko on October 7, 2008 and reported that he tried to work but became weak and lightheaded. (R. 422). He also reported that his hand symptoms persisted and he was scheduled to see a hand surgeon. (R. 422). His physical examination was normal, and Dr. Silko noted that his blood pressure had improved. (R. 413).

Plaintiff returned to Dr. Esper on October 8, 2008 and complained of headaches with associated dizziness, which were exacerbated by sunlight, certain scents and hot baths. (R. 299). His physical examination was unremarkable, except for evidence of some gradient of his right extremities. (R. 299). Dr. Esper ordered lab work and instructed the Plaintiff to remain on Pamelor. (R. 299).

Plaintiff was evaluated by Mary Cermak, M.D., on October 30, 2008 for his bilateral carpal tunnel syndrome. (R. 625-626). Dr. Cermak observed that the Plaintiff's left wrist x-rays showed cystic formation in his scaphoid and some slight early arthritic changes, and that his

EMG was positive for left carpal tunnel. (R. 626). Physical examination revealed diminished light touch and positive Tinel's on the left. (R. 625). Plaintiff was scheduled for left carpal tunnel release. (R. 626).

On November 6, 2008, Dr. Silko completed a headache questionnaire and listed the Plaintiff's diagnoses as a history of heat stroke, headaches, accelerated hypertension, coronary artery disease and carpal tunnel syndrome. (R. 407). He stated that Plaintiff's headaches varied from mild to severe and were "strongly correlated" with exertion of any kind. (R. 407). Associated symptoms included vertigo, nausea/vomiting, malaise, mental confusion, inability to concentrate, and loss of consciousness. (R. 408). He further stated that Plaintiff's headaches occurred on a daily basis and were triggered by physical stress, mild exercise, and warm-to-hot temperatures. (R. 408-409).

Dr. Silko opined that Plaintiff's headaches were related to his cervical disc disease and hypertension, but were "mostly related to his heat stroke and lack of thermoregulation." (R. 409). He indicated that Plaintiff's headaches were frequently severe enough to interfere with his attention and concentration, and that he was incapable of tolerating even low work stress. (R. 411). Dr. Silko stated that even low physical stress provoked an increase in the Plaintiff's body temperature and headaches. (R. 411). He reported that he had instructed that Plaintiff stop activity immediately, rest, and "go to a cool environment" when suffering from a headache. (R. 409). Dr. Silko stated that Plaintiff was precluded from performing even basic work activities when suffering from a headache and would likely be absent from work more than three times per month. (R. 411). He opined that Plaintiff needed to avoid temperature extremes and humidity, and could not engage in pushing or pulling activities. (R. 411). Dr. Silko noted that he began treating Plaintiff in July 2008, but believed his problem began ten years prior. (R. 411).

Plaintiff returned to Dr. Silko on January 13, 2009 and complained of intermittent headaches occurring spontaneously and upon exertion (most commonly upon carrying or lifting). (R. 404). He further reported having intermittent "hot spells" and low grade fevers with exertion. (R. 404). His physical examination was unremarkable, and he was diagnosed with improved hypertension, headache syndromes, and risk of heat stroke. (R. 405).

On January 20, 2009, Dr. Silko wrote a letter in support of Plaintiff's application for disability. (R. 402). Dr. Silko reported that Plaintiff's blood pressure was "better controlled" but his headaches persisted. (R. 402). Dr. Silko reported that Plaintiff had been hospitalized on several occasions for high fevers that generally occurred following physical exertion. (R. 402). He stated that he had not treated Plaintiff during those events, but had discussed them in detail with Dr. Hutzel, the Plaintiff's previous physician. (R. 402). Dr. Silko indicated that Dr. Hutzel was of the opinion that any exertion would be detrimental to Plaintiff's health, and that he "fully support[ed]" that opinion. (R. 402). He stated that Dr. Hutzel was further of the opinion that Plaintiff had permanent damage to his brain's thermoregulatory center. (R. 402). Dr. Silko indicated that Plaintiff's health was further compromised by his cardiac status, and although he had recovered from his heart attack, he continued to have ongoing issues with coronary artery disease and hypertension. (R. 402). Dr. Silko stated that he "completely trust[ed] and agree[d] with Dr. Hutzel's assessment that [Plaintiff was] permanently disabled due to his multiple episodes of heat stroke and impaired thermoregulatory capacity." (R. 402).

Plaintiff continued to see Dr. Silko regularly throughout 2009. (R. 363-401). On March 31, 2009, Plaintiff reported a rapid pulse rate, but denied any chest pain or shortness of breath. (R. 387). He also complained of increased tingling in his left hand, leg and foot. (R. 387). Dr. Silko reported that his physical examination was within normal limits, and an EKG showed no acute changes. (R. 387-388). On May 19, 2009, Plaintiff complained of fatigue and soreness. (R. 383). He claimed that he was "very depressed" with a lack of energy and a decreased appetite. (R. 383). Dr. Silko noted that Plaintiff's cardiac symptoms were fairly stable and his occasional chest pains resolved with rest. (R. 383). Plaintiff reported that he became sweaty and warm with minimal activity. (R. 383). Physical examination revealed some hand numbness and positive Tinel's. (R. 384). Plaintiff was assessed with coronary artery disease, depression and uncontrolled hypertension. (R. 384). His medications were adjusted, and Dr. Silko prescribed an antidepressant. (R. 384).

On July 7, 2009, Plaintiff reported no change in his depression or back pain. (R. 381). He further reported headaches and an increased temperature on hotter days. (R. 381). He

complained of increased numbness in his left hand with diminished strength. (R. 381). Dr. Silko reported that Plaintiff's physical examination was within normal limits, but his affect was flat and depressed on mental status examination. (R. 381). He referred Plaintiff to a hand surgeon for evaluation of his carpal tunnel syndrome. (R. 382). His antidepressant medication remained unchanged, but Dr. Silko suspected Plaintiff would need a higher dosage or different medication in the future. (R. 382).

Plaintiff was seen by Dr. Cermak on August 6, 2009 for follow up of his carpal tunnel syndrome. (R. 379). Plaintiff reported having trouble with fine motor skills and stated he was ready to proceed with surgery. (R. 379).

Plaintiff returned to Dr. Silko on August 18, 2009 and complained of increased back pain with associated right leg pain and numbness. (R. 377). He also complained of weight loss, difficulty with hot temperatures, and lower leg swelling. (R. 377). On physical examination, Dr. Silko found that Plaintiff had trace ankle edema, and had decreased sensation in both hands, left greater than right. (R. 378). Plaintiff exhibited back pain, and had a positive straight leg raising test at 30 degrees. (R. 378). Dr. Silko ordered lab work and adjusted his medications. (R. 378).

On September 9, 2009, Dr. Silko noted a recurrence of Plaintiff's back pain that was gradually diminishing. (R. 375). On physical examination, Plaintiff had a positive straight leg raising test at 40 degrees. (R. 376). On November 10, 2009, Plaintiff complained of fatigue and depression over his disability situation. (R. 370). He reported that his headaches were stable, and that he felt better in the cooler weather. (R. 370). Plaintiff indicated that he had delayed his carpal tunnel surgery. (R. 370). Plaintiff's physical examination was within normal limits. (R. 371). He exhibited a full range of motion in his extremities, his pulses were intact, and there was no edema. (R. 371). Dr. Silko adjusted his medications, and informed Plaintiff that, given the number and extent of his problems, he believed that Plaintiff qualified for disability and he would complete any needed forms. (R. 371).

On December 10, 2009, Plaintiff presented to the emergency room for exacerbation of his low back pain. (R. 226-228). X-rays of Plaintiff's spine showed mild degenerative changes, revealing some straightening of the lumbar lordosis, but the vertebral bodies had maintained their

height and alignment. (R. 233). The disc spaces appeared relatively well preserved (R. 431). There was mild narrowing noted at the L4-5 and L5-S1 levels. (R. 233). Plaintiff was treated with pain medication and a muscle relaxer and discharged in stable condition. (R. 227-228).

Plaintiff returned to Dr. Silko on December 15, 2009, and reported decreased back pain. (R. 363). He complained of left leg weakness/numbness, headaches and depression. (R. 363-364). Physical examination revealed tenderness in the lumbosacral region, a positive straight leg raising test at 30 degrees on the left, and left leg weakness. (R. 364). Plaintiff was able to heel-to-toe walk and his sensation was intact. (R. 364). Dr. Silko assessed him with lower back pain, and noted that if it failed to improve an MRI would be ordered. (R. 364).

On March 31, 2010, Dr. Silko wrote a second letter in support of Plaintiff's application for disability. (R. 558-559). Dr. Silko stated:

> Mr. Howze's main medical problem relates to an episode of heat stroke he suffered prior to my assuming his care. I have reviewed his office and hospital records and concur with that diagnosis. Since that event he has suffered from impaired thermoregulation. Any type of physical exertion can lead to fevers and illness. I would refer you to his old records for more details related to this issue.
>
> In addition, Mr. Howze has numerous serious health conditions which further compromise his ability to work. These include: Coronary artery disease, hypertension, intervertebral disc disease, diabetes mellitus, and recurrent hypokalemia. These problems have caused intermittent chest pain, fatigue, back pain and muscle aches. Each of these symptoms further affects his ability even to perform minor tasks. We are trying our best to treat all of these problems medically; however, his lack of insurance has affected his ability to afford his medicines. We have supplied samples whenever possible, but he frequently goes without much needed medication. This led to episodes of serious depression which we have also tried to treat, however again affording medication has been an issue.
>
> The basis for these diagnoses have related to his history, physical and laboratory findings. Please see the accompanying office notes for these details. His current treatment regimen is: Amlodipine, aspirin, citalopram, hydrocodone, potassium chloride and terazosin. We are trying to manage his diabetes with diet alone for now. His prognosis for recovery is limited, but each of the above is manageable with proper medication. Unfortunately the prognosis for recovery from the heat stroke and impaired thermoregulation is poor.

> His activities are severely limited especially regarding any type of physical
> activity. It is my opinion that he cannot do full-time work, that his disability has
> been present since I first saw him in 2008 and is expected to last 12 months or
> more, indeed for the rest of his life.

(R. 558-559).[3]

On March 31, 2010, Dr. Silko also completed a form entitled "Multiple Impairment Questionnaire." (R. 346-353). In it, Dr. Silko indicated that Plaintiff suffered from heat stroke, impaired thermoregulation, hypertension, coronary artery disease, hypokalemia, diabetes and depression. (R. 346). Dr. Silko listed the following clinical findings as supportive of his diagnoses: elevated blood pressure, elevated blood sugars, and low potassium values. (R. 346). His diagnoses were further based on past records, hospitalizations, symptoms, and physical findings. (R. 346). Plaintiff's symptoms consisted of headaches, chest pain, neck, back and leg pain, extreme fatigue, fever, and weakness on exertion. (R. 347). Dr. Silko opined that, on a scale of one to ten, Plaintiff's pain level and fatigue level were at nine. (R. 348). He concluded that Plaintiff could sit for three hours, stand/walk for a total of less than one hour, frequently needed to move around every 20 minutes, could occasionally lift and carry up to five pounds, and could never push, pull, bend or stoop. (R. 348-349; 352). Dr. Silko found Plaintiff was moderately limited in his ability to use his arms for reaching, and needed to avoid temperature extremes and humidity. (R. 350; 352). Dr. Silko indicated that emotional factors also affected Plaintiff's symptoms and functional limitations, stating that Plaintiff's depression was in response to his chronic pain, as well as his frustration with his inability to afford his medications. (R. 351). He indicated that Plaintiff's symptoms and limitations had been present since at least June 12, 2008, and "likely earlier", and his prognosis was "guarded at best." (R. 346).

On May 14, 2010, Dr. Silko completed forms for the state agency documenting substantially similar findings to those contained in the March 31, 2010 Questionnaire. (R. 337-345). Dr. Silko reported that Plaintiff suffered from depression for which he had been prescribed

---

[3] On July 5, 2011, Dr. Silko added a handwritten note to this report stating that, in addition to the medical problems outlined in his report, Plaintiff had recently been diagnosed with a herniated cervical disc. (AR 558).

medication, but his response had been minimal. (R. 337). He indicated that Plaintiff was much more withdrawn and quiet from when they first met, and exhibited a flat affect. (R. 338). Dr. Silko completed a form entitled "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities", and opined that Plaintiff could occasionally lift/carry two-three pounds, stand and walk for one hour or less, sit for two hours and was limited in his pushing and pulling ability. (R. 344). He further found that Plaintiff could occasionally bend and balance, but never kneel, stoop, crouch and climb. (R. 345). Dr. Silko opined that Plaintiff needed to avoid temperature extremes and humidity. (R. 345).

Plaintiff returned to Dr. Silko on May 26, 2010 and complained of intermittent chest pain and worsening headaches. (R. 335). His physical examination was unremarkable, and Dr. Silko was of the opinion that his chest pain was musculoskeletal related. (R. 336).

On June 9, 2010, Dr. Esper completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" form, and opined that Plaintiff could frequently lift/carry 20 pounds, occasionally lift/carry 50 pounds, had no limitations in his ability to stand, walk or sit, and had no limitations in his pushing and pulling ability. (R. 297). He further found that Plaintiff could frequently bend, kneel and stoop, and occasionally crouch, balance and climb. (R. 298). Dr. Esper opined that Plaintiff needed to avoid increasing temperatures. (R. 298).

On June 11, 2010, Roger Glover, Ph.D., a state agency reviewing psychologist, reviewed Plaintiff's records and concluded that Plaintiff's mental impairment was not severe. (R. 445). He found that Plaintiff had no limitations in his activities of daily living, and had only mild difficulties in maintaining social functioning, concentration, persistence and pace. (R. 455).

On June 11, 2010, Nghia Van Tran, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could perform light work, but could only occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 459-460). He further found that Plaintiff had no manipulative or environmental limitations. (R. 460-461). With respect to Plaintiff's chronic low back and neck pain, Dr. Tran observed that Plaintiff complained of increasing neck pain and recurrent low back pain in 2006. (R. 463). He further

observed that medical records from 2008-2010 showed no significant complaints of neck and back pain. (R. 463). He observed that Plaintiff's diagnostic studies revealed mild degenerative disc disease of the lumbar spine, and spinal canal stenosis of the cervical spine. (R. 463). Dr. Tran noted that Plaintiff's physical and neurological examinations were unremarkable, he was on medication for his hypertension, and his medical records revealed no significant cardiac event. (R. 463). He observed that Plaintiff had chronic headaches due to degenerative disc disease of his cervical spine and was on medication, but the medical records showed no exacerbation in the last two years and his condition appeared to be stable. (R. 464). Dr. Tran concluded that Drs. Hutzel and Esper's assessments which limited Plaintiff with respect to lifting, carrying, standing and walking were not consistent with the overall medical evidence. (R. 464).

On June 25, 2010 Dr. Tran opined that Plaintiff could perform sedentary work and needed to avoid even moderate exposure to extreme heat. (R. 478-485). His remaining assessment remained unchanged. (R. 478-485).

Plaintiff returned to Dr. Silko on July 20, 2010 and complained of chest pain, right hip/leg pain, left arm/wrist pain, and frequent headaches. (R. 491). On physical examination, Dr. Silko found that Plaintiff had right hip tenderness, positive Tinel's in both hands, and a positive straight leg raising at 30 degrees. (R. 492). Dr. Silko increased the dosage of his pain medications and scheduled him for a stress test. (R. 493). On September 14, 2010, Plaintiff complained of muscle pain and increased stress related to family issues. (R. 489). His physical examination was unremarkable and he exhibited a full range of motion in his extremities. (R. 490).

Plaintiff was seen by Dr. Cermak on October 4, 2010 and reported that his carpal tunnel symptoms had worsened. (R. 517). He also complained of burning in his feet. (R. 517). Physical examination revealed a positive Tinel's over the carpal tunnel and a slightly diminished cervical range of motion. (R. 517). Dr. Cermak ordered an EMG to rule out peripheral neuropathy. (R. 518). Plaintiff's EMG dated October 22, 2010 revealed bilateral carpal tunnel syndrome and bilateral chronic cervical polyradiculopathies involving the C6-7 and C8 myotomes, with ongoing denervation on the right. (R. 555).

Plaintiff returned to Dr. Cermak on November 29, 2010 and his physical examination revealed positive Tinel's and radicular symptoms. (R. 644). Dr. Cermak reported that Plaintiff's EMG showed carpal tunnel syndrome and cervical radiculopathy. (R. 644). Plaintiff was scheduled for an MRI and carpal tunnel release surgery. (R. 644).

### B. Medical evidence subsequent to December 1, 2010

An MRI of Plaintiff's cervical spine dated December 21, 2010, revealed moderate to severe diffuse degenerative spondyloysis with mild associated disc bulges or protrusions. (R. 519-520). Specifically, there was a normal cervical lordosis at the C3-4 level. (R. 519). There were several diffuse degenerative changes with disc bulges or protrusions seen from the C3-4 through C6-7 levels. (R. 519). Mild to moderate central canal stenosis was seen at the C4-5 level. (R. 519). There was mild left-sided neuroforaminal narrowing seen at the C4-5 level, and mild to moderate bilateral neuroforaminal narrowing seen at the C5-6 and C6-7 levels. (R. 519).

When seen by Dr. Silko on December 21, 2010, Plaintiff reported increased weakness and numbness in both arms. (R. 669). He reviewed Plaintiff's MRI and noted that it showed significant nerve root changes at several cervical levels. (R. 670).

Plaintiff was seen by Dr. Cermak on January 13, 2011 who reported that Plaintiff's cervical MRI showed severe degenerative spondylosis. (R. 651). On physical examination, Plaintiff had a positive Tinel's and a decreased neck range of motion. (R. 651). Dr. Cermak scheduled Plaintiff for a neurosurgical consultation. (R. 651).

Dr. Cermak performed left carpal tunnel release surgery on January 26, 2011. (R. 601). Plaintiff returned to Dr. Cermak on February 3, 2011, who reported that Plaintiff's wound was well healed, and he was instructed in strengthening exercises. (R. 655).

Plaintiff was evaluated by Michael Verdon, D.O., a neurosurgeon on April 1, 2011 for his complaints of neck pain with headaches and bilateral upper extremity numbness. (R. 595-598). Plaintiff complained of chronic neck pain over the last few years and bilateral shoulder/hand pain and numbness. (R. 596). Dr. Verdon reported that Plaintiff was "very pleasant", in no acute distress and his attention span and concentration were within normal limits. (R. 597). His neurological examination was unremarkable and his sensation was intact. (R. 597). Plaintiff

exhibited 5/5 motor strength, except his right shoulder abduction and left hand were 4/5. (R. 597). Plaintiff's deep tendon reflexes were 2+ bilaterally with positive Hoffman's reflexes bilaterally. (R. 597). Dr. Verdon reported that Plaintiff's station and gait were normal, and his tandem gait and heel-to-toe walking were intact. (R. 597). Plaintiff's posture was normal with no associated local paraspinal muscle tenderness. (R. 597). On range of motion testing, Dr. Verdon found Plaintiff's cervical, thoracic and lumbar spines were within normal limits on flexion, extension, side bending, and rotation in all planes. (R. 597). Plaintiff's straight leg raising testing, Waddell's signs, Faber, Patrick's test and Tinel's sign were all negative. (R. 598). Dr. Verdon observed that Plaintiff's MRI showed multiple level cervical spondylosis with cervical kyphosis at C3-4, with central canal lateral recess stenosis most significant at C4-5 and C5-6. (R. 598). He diagnosed Plaintiff with cervical spondylitic myelopathy, and recommended that he undergo cervical facet injections and obtain a cervical myelogram. (R. 598).

A cervical myelogram conducted on April 15, 2011 revealed significant spondylitic disease at three levels. (R. 803). The C3-4 level to the left of midline with small disc herniation was not "too severe." (R. 803). However, the C4-5, C5-6 and C6-7 levels all had significant canal and foraminal stenosis with nerve root and spinal cord compromise. (R. 803).

On May 5, 2011, Plaintiff was evaluated by Oluchi Ozumba, M.D., a pain management specialist (R. 661-667). Plaintiff was in no apparent distress and his mental status examination was normal. (R. 662). On physical examination, Dr. Ozumba reported that Plaintiff's gait and station were normal, and he was able to toe and heel walk without difficulty. (R. 663). Tenderness was found over the lumbar paraspinous muscles, in the trapezius muscle areas, and in the spinous processes from C5-C7. (R. 663). Facet loading of the cervical spine was positive bilaterally. (R. 663). Plaintiff's strength was 5/5 except for the right shoulder and left hand, which was 4/5. (R. 663). Dr. Ozumba reviewed Plaintiff's diagnostic studies, and diagnosed him with cervical spondylosis with myelopathy, kyphosis, cervical spine stenosis, myalgia, and myositis. (R. 666). It was recommended that Plaintiff undergo cervical facet injections. (R. 666).

In a report dated July 13, 2011, Dr. Silko restated the majority of what he reported in his March 31, 2010 report. (R. 560). Dr. Silko opined:

> On the basis of my treatment of Mr. Howze, I believe he has the capacity to sit for three hours and stand or walk for one hour in an eight hour day on a full-time, sustained basis. However, even within the scope of those limitations, Mr. Howze would need to stand up every twenty minutes to move around for ten minutes before being seated again. He should also not engage in any pushing, pulling, bending, stooping and should not lift or carry more than five pounds at any time.
>
> Mr. Howze's difficulty regarding his body temperature has also had an adverse impact on his ability to tolerate physical and mental stress. In a work environment, he cannot tolerate any level of stress.
>
> Mr. Howze's disability existed when I began treating him in 2008 and I expect that it will last at least twelve months, if not the remainder of his life. The information contained in my March 31, 2010 narrative report and Multiple Impairment Questionnaire remains valid.

(R. 560).

### C. Administrative Hearing

Plaintiff and Edith Edwards, a vocational expert, testified at the hearing before the ALJ on July 7, 2011. (R. 30-56; 137-138). Plaintiff testified that he spent his days watching television, and occasionally swept the floor and did laundry. (R. 38). He indicated that he attended church, but had no hobbies. (R. 39-40). Plaintiff claimed that back pain, arm/hand weakness, neck pain, and chest pains precluded him from working. (R. 40-46). He also testified that he suffered from a thermoregulation problem with associated headaches. (R. 46). He stated that he suffered from depressive symptoms, including fatigue, memory difficulties, and concentration difficulties. (R. 47-48).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was able to perform light work that involved at most occasional postural movements such as bending and stooping, and who should avoid crouching, crawling, squatting or climbing. (R. 52). The hypothetical individual should also avoid excessive heat and cold, and could perform frequent but not continuous grasping. (R. 52). The

16

vocational expert testified that such an individual could perform the jobs of an office helper and information clerk.  (R. 52).  The vocational expert further testified that if limited to sedentary work, jobs such as an unskilled office clerk and surveillance system monitor would be available.  (R. 52-53).

The ALJ issued a written decision on September 12, 2011in which he found that Plaintiff became disabled on December 1, 2010, but not prior to that date.  (R. 13-23).  His request for an appeal with the Appeals Council was denied which rendered the ALJ's decision the final decision of the Commissioner.  (R. 1-6).  He subsequently filed this action.

### III. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood,* 487 U.S. 552, 564-65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Richardson v. Parales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995).  It has been defined as less than a preponderance of evidence, but more than a mere scintilla.  *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  Additionally, if the ALJ's findings of fact are supported by substantial evidence, such are conclusive.  42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.  A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings.").  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole.  *See* 5 U.S.C. § 706.

**IV. DISCUSSION**

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through December 31, 2011 (R. 16). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work

experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

The ALJ concluded that Plaintiff's cervical spondylosis with myelopathy, cervical stenosis, carpal tunnel syndrome, hypertension, coronary artery disease, headaches, and impaired thermoregulation were severe impairments, but determined at step three that he did not meet a listing. (R. 16-17). The ALJ found that, prior to December 1, 2010, the Plaintiff was able to perform light work, and occasionally perform tasks requiring the ability to bend, stoop, handle, crouch, crawl and squat. (R. 17). The ALJ also found that he could perform frequent, but not continuous, fingering or grasping. (R. 17). The ALJ concluded that Plaintiff could perform the jobs of an office helper and information clerk. (R. 22). The ALJ therefore determined that prior to December 1, 2010, Plaintiff was not disabled within the meaning of the Act. (R. 22).

In addition, the ALJ found that beginning December 1, 2010, Plaintiff retained the ability to perform a limited range of sedentary work. (R. 20-21). Specifically, the ALJ found that Plaintiff could lift and carry less than 10 pounds; sit for less than 6 hours in an 8-hour workday; stand or walk for less than 6 hours in an 8-hour workday; and perform tasks not involving the performance of sustained work activity at any exertional level for a full 8 hours a day or 40 hours per week. (R. 21-21). The ALJ concluded that there were no jobs that existed in significant numbers in the national economy that Plaintiff could not perform. (R. 22).

Plaintiff challenges the ALJ's determination that he was not disabled prior to December 1, 2010. Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first argues that the ALJ improperly rejected the opinion of his treating physician, Dr. Silko, relative to his functional capacity prior to December 1, 2010. *See* [ECF No. 9] pp. 16-17. The Third Circuit has repeatedly held that "[a] cardinal principle guiding disability determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)) (citations omitted); *see also*

*Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994). As such, "a court considering a claim for disability benefits must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Massanari,* 247 F.3d 34, 43 (3d Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."). "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

In rejecting Dr. Silko's assessment, the ALJ stated:

> The opinion of Gary Silko, M.D., that the claimant's disability existed when he began treating him in 2008 was considered; however, Dr. Silko's treatment records do not mention any diagnosis or treatment for thermoregulation problems until January 2009 when he assessed that the claimant was at risk of heat stroke. Treatment notes do not clearly support that Dr. Silko was treating the claimant for heat stroke, but rather was relying on the claimant's allegation of heat related problems. While medical source opinion concerning such issues as residual functional capacity and disability must be considered, this is an issue reserved to the Commissioner. An Administrative Law Judge is not bound to accept even a treating physician's conclusion as to disability, particularly when it is not well supported by detailed, clinical and/or diagnostic evidence or it is inconsistent with other substantial evidence in the case record (Exs. B-14F and B-26F).

(R. 20).

A review of the record demonstrates that the ALJ's decision to reject Dr. Silko's opinion as it related to the Plaintiff's thermoregulation impairment was based, in part on assumptions that

are not substantially supported by the record. Dr. Silko has been the Plaintiff's treating physician since June 2008. (R. 300-301). At his initial visit, the Plaintiff complained of headaches with frequent sweating and hot temperature sensitivity. (R. 426). Dr. Silko diagnosed him with, *inter alia*, headache syndromes. (R. 427). In a headache questionnaire dated November 6, 2008, Dr. Silko stated that the Plaintiff's headaches were "mostly related to [the Plaintiff's] heat stroke and lack of thermoregulation." (R. 409). He further stated that Plaintiff's headaches "strongly correlated" with exertion of any kind, and that even low physical stress caused an increase in the Plaintiff's body temperature and headaches. (R. 411). Dr. Silko reported that he had instructed the Plaintiff to stop activity immediately, rest, and "go to a cool environment" when suffering from a headache. (R. 409).

Moreover, in a report dated January 20, 2009, Dr. Silko summarized the Plaintiff's prior treatment with Dr. Hutzel and stated:

> The main reason he has applied for disability is his multiple episodes of heat stroke. As you know, Mr. Howze was hospitalized on several occasions for high fevers that generally occurred after physical exertion. I did not provide care for him during these events but I have discussed them in detail with his previous physician, David Hutzel, M.D. Dr. Hutzel feels that any exertion, whatsoever is detrimental to Mr. Howze's health. I fully support Dr. Hutzel's opinion. From a personal and professional standpoint Dr. Hutzel is one of the most respected internists in the Erie area.
>
> It is Dr. Hutzel's opinion that Mr. Howze has permanent damage to his brain's thermoregulatory center which is the cause of this problem. …
>
> I am sorry I cannot supply any further details as I have only provided care for Mr. Howze for about 6 months now. Again I completely trust and agree with Dr. Hutzel's assessment that Mr. Howze is permanently disabled due to his multiple episodes of heat stroke and impaired thermoregulatory capacity.

(R. 402). The medical record illustrates that Dr. Silko did not simply rely on the Plaintiff's allegations of heat related problems in rendering his opinion. Rather, Dr. Silko's opinion was based upon his own treatment of the Plaintiff, a review of the Plaintiff's past medical records, and his extensive discussions with Dr. Hutzel. The Commissioner argues that the Plaintiff's "concern" with respect to Dr. Silko's report is "misplaced" since the ALJ posed a hypothetical

question to the vocational expert accommodating his limitations. *See* [ECF No. 11] p. 8. The vocational expert identified a surveillance system monitor job, which the Commissioner argues is physically undemanding and is performed in a temperature controlled environment. *Id.* However, according to Dr. Silko, the Plaintiff's headaches strongly correlate with exertion of any kind, and even low physical stress causes an increase in the Plaintiff's body temperature and headaches. (R. 411). It is simply unclear whether the ALJ's consideration of Dr. Silko's opinion would be impacted by the fact that it was not based solely on the Plaintiff's subjective complaints. An ALJ's rejection of a treating physician's opinion is not supported by substantial evidence where it is based upon factual inaccuracies or mischaracterizations of evidence. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008); *see also Wilson v. Astrue*, 2009 WL 793039 at *16 (W.D.Pa. 2009). The ALJ on remand shall address the above evidence in connection with his evaluation of Dr. Silko's opinion.

To the extent that the ALJ rejected Dr. Silko's opinion as to the Plaintiff's functional limitations relative to his remaining impairments, it is further unclear whether the ALJ considered, and then discredited, Dr. Silko's opinion dated March 31, 2010. In concluding that the Plaintiff's disability began on December 1, 2010, the ALJ referenced Dr. Silko's July 12, 2011 opinion, wherein he concluded that Plaintiff sit for three hours, and stand or walk for one hour in an eight hour day on a sustained basis, but needed to stand up every twenty minutes to move around for ten minutes before being seated again. (R. 21). The ALJ further observed that the Plaintiff should not engage in any pushing, pulling, bending or stooping, and should not lift or carry more than five pounds at any time. (R. 21). As pointed out by the Plaintiff, however, these same limitations were assessed by Dr. Silko in March 2010, and the ALJ's decision does not reflect that he considered this assessment. As previously stated, the ALJ is required to "adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266. The ALJ is directed to address this evidence on remand.

Plaintiff further argues that the ALJ erred in relying on the opinion of Dr. Tran, the state agency reviewing physician, who concluded that he could perform light work. (R.458-465). The ALJ found that Dr. Tran's opinion was consistent with the overall evidence of record and

assigned it "significant great weight." (R. 20). To the extent the ALJ relied upon Dr. Tran's assessment in rejecting Dr. Silko's opinion, the ALJ will necessarily re-examine this opinion, as well as Dr. Tran's later opinion, in conjunction with his analysis of all the evidence in the record.

Plaintiff next challenges the ALJ's rejection of Dr. Silko's opinion on the basis that there were no detailed clinical and/or diagnostic evidence to support disabling limitations prior to December 1, 2010. In reaching this conclusion, the ALJ found that the Plaintiff's physical examinations in January 2009 and February 2010 showed normal gait and station, and his neurological examinations were within normal limits. (R. 20). As the Plaintiff points out, this is the type of "lay opinion" that is precluded by the case law. *Plummer*, 186 F.3d at 429. Moreover, "[i]t is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence." *Moffatt v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010). Here, the Plaintiff's physical examinations were essentially the same after December 1, 2010, the date the ALJ found him disabled, as they were before. For example, when examined by Dr. Verdon on April 1, 2011, Plaintiff's neurological examination was unremarkable, his station and gait were normal, and his tandem gait and heel-to-toe walking were intact. (R. 597). On range of motion testing, Dr. Verdon found the Plaintiff's cervical, thoracic, and lumbar spines were within normal limits in all planes. (R. 597). On May 5, 2011, Dr. Ozumba reported that the Plaintiff's station and gait were normal, and he was able to toe and heel walk without difficulty. (R. 663). Accordingly, this evidence does not necessarily constitute contradictory medical evidence in this case.

Similar deficiencies are found with respect to the ALJ's evaluation of the Plaintiff's mental impairment. The Plaintiff states in his Brief:

> …The ALJ failed to discuss the evidence concerning how Plaintiff's ability to function in the workplace was impacted by his depression and reduced tolerance for stress. (Indeed, the ALJ does not even find that Plaintiff's depression is a step-two non-severe impairment; he just proceeds as if it does not exist.) But the issue demanded the ALJ's appropriate consideration. In particular, Plaintiff was entitled to have the ALJ fairly consider the combined effect of his physical and mental impairments on his ability to perform work-related activities. *See generally Bennett v. Barnhart,* 264 F.Supp.2d 238, 256 (W.D. Pa. 2003).

In October, 2006, neurosurgeon Dr. Khoja observed that Plaintiff's affect was depressed. Review of systems was notable for memory problems, depression, and anxiety (Tr. 333). In May, 2009, Dr. Silko noted that Plaintiff was very depressed. In July, 2009, Plaintiff's affect was flat/depressed (Tr. 381-383). In November, 2009, Dr. Silko noted that Celexa was giving Plaintiff only minimal relief (Tr. 370). In his March 31, 2010 report, Dr. Silko explained that Plaintiff's chronic pain and his inability to afford his medications had caused Plaintiff to experience episodes of serious depression. The doctor noted that Plaintiff's body temperature regulation is impaired and affected by both physical and mental stress. Since 2008, he has lacked the capacity to tolerate even low work stress (Tr. 558, 351-352). On a May 14, 2010 questionnaire, Dr. Silko explained that Plaintiff's depression had responded minimally to medication. The doctor wrote that Plaintiff had become more withdrawn and was quieter, with loss of interest, and a flat affect (Tr. 337-338). Surely, Plaintiff was entitled to have the ALJ consider what impact his depression and decreased tolerance for stress may have had on his ability to perform sustained work activity.

[ECF No. 9] pp. 20-21 (footnote omitted).

Here, we agree with Plaintiff that the ALJ's failure to have considered the effects of his depression at any step in the sequential evaluation process necessitates a remand under the previously described case law.[4]

Finally, in light of the Court's finding that the case shall be remanded to the Commissioner for the reasons discussed above, we need not address Plaintiff's challenge to the ALJ's credibility determination inasmuch as the ALJ will necessarily reevaluate his credibility in the course of reconsidering the opinion and medical evidence.

## V. CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Summary Judgment will be granted to the extent remand for reconsideration is sought, and denied to the extent reversal and

---

[4] The Commissioner argues that a remand is not warranted since Dr. Glover concluded that Plaintiff's mental impairment was not severe, and it was significant that Plaintiff had no mental health referrals or mental health treatment. *See* [ECF No. 11] pp. 10-11. However, the ALJ did not discuss or rely on Dr. Glover's assessment, and we may not supply reasoning or conclusions which are not clearly stated. *See Fargnoli*, 247 F.3d at 44 n.7 ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

an immediate award of benefits is sought, and Defendant's Motion for Summary Judgment will be denied. The decision of the ALJ will be vacated and the case remanded for further consideration consistent with this Memorandum Opinion.

"On remand, the ALJ shall fully develop the record and explain [his or her] findings … to ensure that the parties have an opportunity to be heard on the remanded issues and prevent *post hoc* rationalization" by the ALJ. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3d Cir. 2010); *see also Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 432 (W.D.Pa. 2010). Testimony need not be taken, but the parties should be permitted input via submissions to the ALJ. *Thomas*, 625 F.2d at 801 n.2.

An appropriate Order follows.

McVerry, J.[5]

_____

[5] This matter was originally assigned to Chief Judge Sean J. McLaughlin. Following his resignation, this matter was reassigned. *See* [ECF No. 12]. The Court has reviewed and considered the administrative record, as well as the parties' filings in this action.

25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HENRY EARL HOWZE,         )
         )
         Plaintiff,      )     Civil Action No. 12-160 Erie
         )
    v.         )
         )
CAROLYN W. COLVIN,         )
Acting Commissioner of Social Security,  )
         )
         Defendant.    )

## ORDER OF COURT

    **AND NOW**, this 3rd day of September, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. Plaintiff's Motion for Summary Judgment [ECF No. 8] is **GRANTED** in part and **DENIED** in part.

2. Defendant's Motion for Summary Judgment [ECF No. 10] is **DENIED**.

3. The case is **REMANDED** to the Commissioner of Social Security for further consideration and/or proceedings consistent with the foregoing Memorandum Opinion of the Court; and

4. The Clerk will docket the case closed forthwith.

                    BY THE COURT:


                    <u>s/ Terrence F. McVerry</u>
                    United States District Judge


cc:    All parties of record